UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WENDY L. BRUSH,                          :
                                         :CIVIL ACTION NO. 3:14-CV-2143
          Plaintiff,                     :
                                         :(JUDGE CONABOY)
          v.                             :
                                         :
CAROLYN W. COLVIN, Acting                :
Commissioner of the Social               :
Security Administration,                 :
                                         :
          Defendant.                     :
_____

**MEMORANDUM**

Here we consider Plaintiff's *pro se* appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  She
originally alleged disability due to a number of physical and
mental impairments beginning on October 1, 2005, but amended the
onset date to January 26, 2011,.  (R. 21, 148.)  The Administrative
Law Judge ("ALJ") who evaluated the claim concluded that
Plaintiff's severe impairments of history of seizure and back pain
did not meet or equal the listings alone or in combination with
Plaintiff's non-severe impairments.  (R. 24-25.)  The ALJ found
that Plaintiff had the residual function capacity ("RFC") to
perform light work with certain limitations and that such work was
available through the date last insured, December 31, 2012.  (R.
26-30.)  The ALJ therefore denied Plaintiff's claim for benefits.
(R. 30.)  With this action, Plaintiff argues that the decision of

the Social Security Administration is error for the following reasons: 1) the ALJ failed to keep the records open as requested; 2) the ALJ erred by failing to properly evaluate her mental health impairments; 3) the ALJ erred by failing to properly assess her residual functional capacity; and 4) the ALJ erred by relying on the vocational expert's testimony.  (Doc. 15 at 4-7.)  For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly denied.

## I. Background

### A. *Procedural Background*

On January 8, 2013, Plaintiff protectively filed an application for DIB.  (R. 21.)  As noted above, she now alleges disability beginning on January 26, 2011.  (*Id.*)  In her application for benefits, Plaintiff claimed her ability to work was limited by epilepsy, carpal tunnel syndrome, anxiety and panic attacks, depression, back injury, and headaches due to a car accident.  (R. 148.)  The claim was initially denied on February 19, 2013.  (R. 21.)  Plaintiff filed a request for a review before an ALJ on April 17, 2013.  (R. 21.)  On February 14, 2014, Plaintiff appeared at a hearing before ALJ Jarrod Tranguch.  (R. 21.)  Vocational Expert Josephine Doherty also testified at the hearing.  (*Id.*)  Plaintiff's main representative through the administrative process was Mario Davila, a non-attorney representative from Binder and Binder.  (*Id.*)  At the ALJ hearing,

Plaintiff was represented by a Binder and Binder attorney, Jesse Traugot. (*Id.*) The ALJ issued his unfavorable decision on April 25, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period. (R. 30.)

On May 9, 2014, Plaintiff filed a Request for Review with the Appeal's Council. (R. 17.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 17, 2014. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

On November 7, 2014, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on February 4, 2015. (Docs. 11, 12.) Plaintiff filed the document we have construed as her supporting brief on April 30, 2015. (Docs. 15, 16.) Defendant filed her opposition brief on June 2, 2015. (Doc. 17.) Plaintiff did not file a reply brief and the time for doing so has passed. Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on October 3, 1973, and was thirty-nine years old on the date last insured. (R. 17.) Plaintiff has a high school education. (R. 29.) Plaintiff has past relevant work as a mail carrier. (*Id.*)

**1.   <u>Impairment Evidence</u>**

3

As noted above, Plaintiff identifies many impairments in her application for benefits.  (R. 148.)  The ALJ addressed Plaintiff's claims regarding her history of seizures, back pain, carpal tunnel syndrome, headaches, asthma, depression, anxiety and panic attacks.  (R. 24.)  Plaintiff's claimed errors involve her seizure disorder, mental impairments, the ALJ's RFC function determination specifically related to her abilities to sit, stand and walk, and his step five determination related to Plaintiff's ability to do simple, unskilled work.[1]  (Doc. 15 at 4-7.)  Therefore, we focus our review of Plaintiff's impairments on her history of seizures, back problems, and mental impairments during the relevant time period of January 26, 2011, through December 31, 2012.[2]

**a.    Seizure and Back Impairments**

On May 13, 2009, Plaintiff was seen at Geisinger's emergency department because she had a seizure about thirty minutes before arrival.  (R. 251.)  The seizure lasted three to four minutes and Plaintiff was reported to have shaking all over, "stiff as a board, [and] foaming at the mouth."  (*Id.*)  Plaintiff denied pain or other injuries and all systems were normal.  (R. 252-53.)

On November 19, 2009, Frank G. Gilliam, M.D., saw Plaintiff on the referral of Dr. Janusz Wolanin, Plaintiff's primary care

---

[1]  Plaintiff does not provide citation to medical evidence of record.

[2]  To put these impairments into context, we review some records outside the relevant time period.

4

physician, and noted that Plaintiff presented with a history of possible seizures since 1999 and she wanted to "know what is going on."  (R. 198, 205.)  She reported that a typical event consisted "of a 'weird feeling' in her head quickly followed by anxiety, a sense that she is paralyzed and disconnected from her surrounding." (*Id.*)  Plaintiff stated that this occurred once or twice a week. (*Id.*)  She and her mother also described at least two GTC seizures in the past.[3]  (*Id.*)  Plaintiff had been taking Keppra for the seizures for the preceding four months (she had not taken anything previously), and she reported increased fatigue and sedation. (*Id.*)  Dr. Gilliam noted that "current relevant comorbidities include depression."  (R. 198.)  Review of systems, physical examination, and mental status were normal.  (R. 200.)  Dr. Gilliam considered it a possibility that Plaintiff had temporal lobe epilepsy.  (R. 200.)  He changed Plaintiff's medication and, discussed with her that if the seizures did not stop, he would consider video/EEG and possible MRI.  (*Id.*) His diagnosis for the visit was "seizures, complex partial, intractable."  (R. 203.)

On September 17, 2010, Plaintiff was seen by Geisinger's Trauma Service after a motor vehicle accident for evaluation of facial trauma.  (R. 247.)  The diagnosis was facial contusion,

---

[3]  "GTC seizures" are generalized tonic-clonic seizures which involve the entire body.  They are also known as grand mal seizures. http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm.

closed head injury, seizure, and facial abrasions.  (R. 249.)

On the same day, Plaintiff had a head and cervical spine CT as a result of the motor vehicle accident.  (R. 265.)  The head CT was normal and the cervical spine CT showed no acute intracranial abnormality and no traumatic osseous injury to the cervical spine. (R. 265-66.)  CT scans of the chest, abdomen and pelvis resulted in the following impression: "Mild indentation of central portion of superior endplates of T10 and T11 vertebral bodies without apparent discrete fracture . . . . No surrounding hematoma or soft tissue swelling to suggest acute etiology.  These may represent Shmorl's nodes.  However, less likely differential of subtle compression fractures is not entirely excluded."  (R. 272.)

On September 29, 2010, Plaintiff saw her primary care physician, Janusz Wolanin, M.D., presenting with injury related to her car accident.  (R. 466.)  Plaintiff reported right chest and lower back pain.  (*Id.*)  She also reported that symptoms had been absent prior to the injury.  (*Id.*)  On examination, Plaintiff had mild tenderness in her spine bilaterally.  (R. 467.)  The muscoloskeletal examination was otherwise normal.  (*Id.*) Plaintiff's assessment was "Contusion of Chest Wall," and "Backache Unspec."  (*Id.*)

On November 22, 2010, Plaintiff saw Dr. Wolanin with complaints of back pain, worse with movement, and difficulty sleeping.  (R. 459.)  He observed that Plaintiff appeared well and

6

had no signs of present distress.  (*Id.*)  On physical examination,
Dr. Wolanin reported the following musculoskeletal findings:

> Walks with a normal gait, ttp over entire
> paraspinal musc Upper extremities: Normal to
> inspection and palpation.  No tenderness over
> the upper extremities bilaterally.  No
> evidence of lymphedema.  No instability
> bilaterally. Strength: Normal and symmetric.
> Normal muscle tone bilaterally.  Normal
> muscle bulk bilaterally.  Full ROM
> bilaterally.  Lower Extremities: Normal to
> inspection and palpation.  No tenderness of
> the lower extremities bilaterally.  No
> instability bilaterally.  Strength: Normal
> and symmetric.  Normal muscle tone
> bilaterally.  Muscle bulk is normal
> bilaterally.  Full ROM bilaterally.

(R. 461.)   He made the following neurological findings: "Alert and
oriented x3.  Mood is normal.  Affect is normal.  Memory is intact.
Attention is WNL.  Sensation intact to light touch.  Achilles and
patellar DTR's are brisk and symmetrical.  Coordination is normal.
Romberg's test is intact."  (*Id.*)  Dr. Wolanin's assessment was
"Backache Unspec." "Insomnia Unspecified," and "Anxiety State
Unspec."  (*Id.*)

On December 20, 2010, Plaintiff again saw Dr. Wolinan for
follow up after her accident.  (R. 457.)  Plaintiff reported that
"Flexeril makes her loopy," Soma had helped in the past, and she
still had pain.  (*Id.*)  Musculoskeletal examination findings were
essentially the same as recorded at Plaintiff's November 22, 2010,
visit.  (R. 458.)

On January 17, 2011--Plaintiff's first medical encounter

7

during the relevant time period--Dr. Wolinan noted that Plaintiff continued to complain of neck pain, decreased range of motion, and stiffness.  (R. 454.)  Dr. Wolinan observed that Plaintiff "[a]ppears well.  No signs of apparent distress present.  Speech is clear and appropriate for age. . . . Patient is cooperative.  Facial expression appears pleasant." (*Id.*)  On physical examination, Plaintiff's neck was "[n]ormal to inspection.  Unremarkable on palpation.  Trachea midline." (R. 455.)  Dr. Wolinan recorded the following muscoloskeletal examination findings: "Walks with normal gait.  Upper Extremities: Normal to inspection and palpation.  No evidence of lymphedema.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally.  Lower Extremities:  Normal to inspection and palpation.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally." (*Id.*)  He recorded the following neurological examination findings: "Alert and oriented x3.  Mood is normal.  Affect is normal.  Memory is intact.  Attention is WNL.  Sensation intact to light touch.  Achilles and patellar DTR's are brisk and symmetrical.  Coordination is normal.  Romberg's test is intact." (*Id.*)  Dr. Wolinan's assessment was "Backache Unspec," "Contusion Chest Wall," and "Sprains & Strains Neck." (*Id.*)

On February 16, 2011, Plaintiff presented to Dr. Wolinan with increasing back pain.  (R. 451.)  She reported that she also had

numbness in her lower extremities.  (*Id.*)  Examination of the neck was unremarkable.  (R. 452.)  Musuloskeletal examination findings were similar to those of the January visit.  (*Id.*)  Dr. Wolinan's assessment was "Backache Unspec."  (*Id.*)  Dr. Wolinan recommended x-ray of the lumbar spine.   (*Id.*)

On March 2, 2011, Plaintiff had EMG because of left leg pain. (R. 450.)  All motor studies were normal and needle examination of the left and low lumbar paraspincal muscles was normal.  (R. 450.) The Impression was "[n]ormal study, no electrodiagnostic evidence of neuropathy, myopathy or radiculopathy."  (*Id.*)  On the same date, cervical spine x-rays were normal.  (R. 449.)  Lumbar spine x-rays showed mild levoscoliosis of the lumbar spine and the remainder of the study was normal.  (R. 448.)  Thoracic spine studies showed mild dextroscoliosis of the thoracic spine and the remainder of the study was normal.  (R. 447.)

On March 14, 2011, Plaintiff saw Dr. Wolinan for routine follow up.  (R. 444.)  She continued to complain of back and neck pain.  (*Id.*)  Examination of her neck was normal and unremarkable on palpation.  (R. 445.)  Muskuloscletal examination showed the following: "Walks with a normal gait. Spine: Moderate midline tenderness of the spine.  Upper Extremities: Normal to inspection and palpation.  No evidence of lymphedema.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally. Lower Extremities:  Normal to inspection and palpation.  Strength:

Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally." (*Id.*)  Dr. Wolinan's assessment was "Backache Unspec," and "Sprains & Strains Neck." (*Id.*)

Plaintiff had another regular monthly follow up visit with Dr. Wolinan on April 6, 2011. (R. 441.)  She continued to complain of back pain and Dr. Wolinan noted that Plaitniff was extremely anxious due to her friend's death the day before. (*Id.*)  Findings regarding Plaintiff's musculoskeletal examination was the same as at the previous visit except that Dr. Wolinan did not note midline tenderness of the spine. (R. 442.)  Assessment was "Backache Unspec," and "Anxiety State Unspec." (*Id.*)

At her regular visit on May 4, 2011, Dr. Wolinan reported that Plaintiff was doing well and had dental work the day before. (R. 435.)  Subjective reports and objective physical findings were unremarkable. (R. 435-36.)  Assessment was "Teeth and Supporting Structures Disorders," "Backache Unspec," and "Anxiety State Unspec." (*Id.*)

On June 1, 2011, Plaintiff saw Dr. Wolinan for a routine visit. (R. 432.)  Dr. Wolinan noted that Plaintiff was doing well with no new complaints but she continued to report chronic pain and anxiety. (*Id.*)  Dr. Wolinan recorded that Plaintiff appeared well and her physical examination was unremarkable, including normal mood and affect. (*Id.*)  Assessment was "Backache Unspec," and "Anxiety State Unspec." (*Id.*)

10

On June 29, 2011, Dr. Wolanin noted that Plaintiff still had back pain that "comes and goes." (R. 429.)  He also noted that medication helped and that Plaintiff needed an EEG. (*Id.*) Otherwise, Dr. Wolanin's office visit notes and assessment are the same as recorded in early June. (R. 429-30.)

On July 14, 2011, Plaintiff had an EEG at the request of Dr. Wolanin because of Plaintiff's history of seizures. (R. 496.)  The impression was "Normal awake and drowsy EEG." (*Id.*)

Plaintiff had another routine office visit with Dr. Wolinan on July 22, 2011. (R. 423.)  Plaintiff complained of congestion, cough, abdominal discomfort, and other symptoms which she had for three days and were similar to those recently experienced by her sister. (*Id.*)  Otherwise, Dr. Wolanin's office visit notes and assessment are the same as recorded in early June. (R. 423-24.)

On August 3, 2011, Plaintiff saw Dr. Wolanin for follow up. (R. 420.)  She continued to complain of chronic pain that interrupted her sleep. (*Id.*)  Otherwise Plaintiff's subjective reporting was unremarkable. (*Id.*)  Dr. Wolanin's examination was also unremarkable, including his musculoskeletal exam. (R. 421.) His assessment was "Backache Unspec," "Insomnia Unspecified," and "Anxiety State Unspec." (*Id.*)

On August 17, 2011, Plaintiff saw Dr. Wolanin for a routine visit. (R. 417.)  He reported that Plaintiff was doing well. (*Id.*)  She was recovering from hernia surgery, had no new

11

complaints but still had chronic pain and anxiety.  (*Id.*)
Plaintiff's objective reporting was otherwise unremarkable.  (*Id.*)
Dr. Wolinan observed that Plaintiff appeared well and had no signs
of present distress.  (*Id.*)  His phsyical examination was
unremarkable.  (R. 418.)  Dr. Wolanin's assessment included
"Backache Unspec," "Insomnia Unspecified," and "Anxiety State
Unspec."  (*Id.*)

On September 9, 2011, Plaintiff saw Dr. Wolanin for a routine
visit.  (R. 414.)  He reported that she was doing well but had
woken up that morning with congestion and sinus pressure and was
requesting an antibiotic.  (*Id.*)  Plaintiff had a fever.  (*Id.*)
Otherwise, Plaintiff did not report any difficulties, and Dr.
Wolanin's physical examination was unremarkable.  (R. 414-15.)

On October 3, 2011, Plaintiff saw Dr. Wolanin for follow up.
(R. 406.)  He recorded that Plaintiff reported she had been feeling
fine since her last visit--"No seizures recently.  No dizziness,
fatigue, or headache."  (*Id.*)  Subjective and objective evaluations
were unremarkable.  (R. 406-07.)  No Assessment or Plan was
recorded.  (*See* R. 407.)

On October 24, 2011, Plaintiff saw Dr. Wolanin for a routine
visit.  (R. 401.)   Subjective and objective evaluations were
unremarkable.  (R. 401-02.)  Assessment was "Backache Unspec," and
"Anxiety State Unspec."  (R. 402.)

At an office visit to Dr. Gilliam on October 24, 2011,

12

Plaintiff again reported she experienced events she described as a a "'weird feeling' in her head quickly followed by anxiety, a sense that she is paralyzed and disconnected from her surrounding around bedtime, states it feels 'like a wave' and a 'sparkler going off my head.'" (R. 206.)  Plaintiff reported she did not know how long the seizure lasted but estimated two minutes.  (*Id.*) She stated this type of seizure occurred once or twice a month.  (*Id.*)  Plaintiff also reported two episodes where she had very vivid auditory/visual hallucinations: "one episode in which she was awake, had recently started Seroquel, and talked to 'shadows' and lasted 30 minutes and another episode a few weeks ago when she was going to sleep (20 minutes), where she became very fearful and saw shadows."  (*Id.*) Plaintiff had the same concerns and comorbidities as in November 2009.  (R. 206.)  Prior evaluations included normal brain CT and abnormal EEG by Plaintiff's report but Dr. Gilliam did not have the report.  (*Id.*)  Plaintiff had not had Video/EEG or neuropsychological testing.  (*Id.*)  Plaintiff's physical and mental status examinations were normal.  (R. 207-08.)  She had a headache at the time--one on a scale of one to ten.  (R. 209.)  Dr. Gilliam thought the longer events were most likely not seizure in nature but could be related to adverse effects of Seroquel or acute psychosis.  (R. 208.)  Plaintiff was encouraged to follow up with psychiatry regarding the two longer events.  (*Id.*)  The plan was to change medications and admission to the epilepsy monitoring unit

13

was discussed as a possibility if Plaintiff continued to have loss of awareness or lapses in time.  (*Id.*)

On December 5, 2011, Plaintiff saw Dr. Wolanin for follow up. (R. 395.)  He recorded that Plaintiff had no new complaints but reported she still had chronic pain and anxiety.  (*Id.*)  Subjective and objective evaluations were unremarkable.  (R. 395-96.) Assessment was "Insomnia Unspecified," "Backache Unspec," and "Anxiety State Unspec."  (R. 396.)

On January 4 and January 30, 2012, Plaintiff saw Dr. Wolanin for routine visits.  (R. 386, 392.)  She was doing well with no new complaints.  (*Id.*)   Subjective and objective evaluations were unremarkable.   (R. 386-87, 392-93.)  Assessment was "Insomnia Unspecified," "Backache Unspec," and "Anxiety State Unspec."  (R. 387, 393.)

On March 14, 2012, Plaintiff was seen by Geisinger's Trauma Service after a motor vehicle accident.  (R. 243-44.)  Plaintiff struck her head and did not remember the accident and was not aware if she lost consciousness or if she had a seizure.  (R. 244.)  No acute intervention was necessary at the time and Plaintiff was diagnosed with head contusion.  (R. 247.)

On March 16, 2012, Plaintiff went to Dr. Wolanin for follow up after the car accident.  (R. 371.)  He reported Plaintiff was "[u]nsure if she had a seizure because she does not remember the accident; has history of seizures and taking medications.

Complaining of chronic low back pain; states it has not worsened since MVA.  No other injuries.  All x-rays . . . were negative." (*Id.*)  Physical examination of Plaintiff's musculoskeletal system showed the following: "Walks with a normal gait.  Upper extremities: Normal to inspection and palpation.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally.  Lower Extremities: Normal to inspection and palpation.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally."  (R. 372.)

On April 25, 2012, Plaintiff saw Dr. Wolanin for follow up. (R. 368.)  He noted that she was doing well.  (*Id.*)  He also noted that Plaintiff reported she "[r]einjured old orbit blowout fracture in MVA.  With pain; asking for something for breakthrough pain." (*Id.*)  Subjective and objective evaluations were unremarkable.  (R. 368-69.)  Assessment was "Backache Unspec," "Insomnia Unspecified," and "Anxiety State Unspec."  (R. 369.)

On May 11, 2012, Plaintiff saw Dr. Wolanin for a routine visit.  (R. 365.)  He recorded that Plaintiff reported she was feeling better, had less pain from the car accident, she was still not driving, and had a follow up appointment with a neurologist the next month.  (*Id.*)  Subjective and objective evaluations were unremarkable.  (R. 365-66.)  Assessment was "Fx Skull/face Mult Closed W/o intracranial inj. No loss consc,"  "Backache Unspec," "Insomnia Unspecified," and "Anxiety State Unspec."  (R. 366.)

On June 6, 2012, Plaintiff saw Dr. Wolanin for follow up.  (R. 362.)  He reported she was doing well with no new complaints. (*Id.*)  Objective and subjective findings were similar to those of her previous visits.  (R. 362-63.)  Dr. Wolanin's assessment was "Backache Unspec," and "Anxiety State Unspec."  (R. 363.)

On June 22, 2012, Plaintiff saw Dr. Wolanin for follow up. (R. 359.)  Though she was doing well with no new complaints, Plaintiff reported chronic pain.  (*Id.*)  Subjective and objective evaluations were unremarkable.    (R. 359-60.)  Assessment was "Backache Unspec," and "Anxiety State Unspec."  (R. 360.)

On July 2, 2012, Plaintiff saw Dr. Wolanin for follow up.  (R. 343.)  He noted that she continued to have chronic pain and anxiety.  (*Id.*)  He also observed that she appeared well and had no signs of present distress.  (*Id.*)  His physical examinatin was unremarkable.  (R. 344.)   Dr. Wolanin's assessment included "Epilepsy Unspec W/o Intractable," "Backache Unspec," and "Anxiety State Unspec."  (*Id.*)

On July 27, 2012, Plaintiff was seen at the Geisinger radiology department for diagnostic imaging on Dr. Wolanin's referral because of lumbar pain and thoracic back pain.  (R. 234-35.)  Plaintiff had had a motor vehicle accident on March 14, 2012. (R. 236.)  Findings regarding the lumbosacral spine included vertebral bodies maintained in height and alignment, intervertebral disk spaces preserved, paraspinal soft tissues within normal

16

limits.  (*Id.*)  The Impression was "[n]o acute bony abnormality."
(*Id.*)  Findings regarding the thoracic spine included normal
vertebrae in height and alignment, nonvertebral disk spaces
preserved, paraspinal soft tissues within normal limits, and
Schmorl's nodes were seen in a few midthoracic vertebrae.  (R.
237.)  The Impression was "[n]o acute bony abnormality."  (*Id.*)
CT scan of the chest showed no current pulmonary nodules and no
acute process.  (R. 238.)

On August 1, 2012, Plaintiff was seen by Dr. Wolanin for
follow-up.  (R. 337.)  She was again doing well with no new
complaints.  (*Id.*)  Subjective reports and objective findings were
unremarkable.  (R. 337-38.)  Dr. Wolanin's assessment included
"Epilepsy Unspec W/o Intractable," "Insomnia Unspecified," and
"Anxiety State Unspec."  (*Id.*)

On August 29, 2012, Plaintiff again saw Dr. Gilliam.  (R.
216.)  Plaintiff reported she was having seizures twice a week and
also reported increased anxiety.  (R. 216.)  Plaintiff stated  she
had recently had a single car accident where her car rolled.  (*Id.*)
Plaintiff's physical and mental status examinations were normal.
(R. 217-18.)  In his "Impression/Plan," Dr. Gilliam notes that
Plaintiff "did not come for the scheduled video/EEG, but she states
she is ready at this time."  (R. 218.)  He also noted that
Plaintiff was very anxious and tearful.  (*Id.*)  Plaintiff's
medication was changed and she was to be scheduled for a video/EEG.

(*Id.*)   Plaintiff was to return in four months, around December 29, 2012.  (R. 219.)

On September 24, 2012, Planitiff saw Dr. Wolanin for follow up. (R. 325.)  She reported she was doing well with no new complaints.  (*Id.*)  On physical examination, Dr. Wolanin findings were unremarkable.  His assessment included "Epilepsy Unspec W/o Intractable," "Backache Unspec," "Insomnia Unspecified," and "Anxiety State Unspec."  (*Id.*)

On October 22, 2012, Plaintiff saw Dr. Wolanin for follow up. (R. 317.)  He noted Plaintiff was doing well with no new complaints, and Plaintiff reported she still had chronic pain and anxiety.  (*Id.*)  Other than that general notation, no problems were recorded based on Plaintiff's subjective reporting.  (*Id.*)  Dr. Wolanin's objective examination and observation was unremarkable. Dr. Wolanin's assessment included "Epilepsy Unspec W/o Intractable," "Backache Unspec," "Insomnia Unspecified," and "Anxiety State Unspec."  (*Id.*)

On November 19, 2012, Plaintiff saw Dr. Wolinan.  (R. 357.) The visit was unremarkable.  (R. 356-57.)  The Assessment was "Hypertrigliceridemia Pure," "Epilepsy Unspec W/o Intractable," "Asthma Unspec W/o Status Asthmaticus," and "Insomnia Unspecified." (R. 357.)

On December 17, 2012--the last medical encounter during the relevant time period--Plaintiff saw Dr. Wolanin for follow up.  (R.

353.)  He noted she was doing well but was complaining of nausea after starting cholesterol medication.  (*Id.*)  Other than the nausea, subjective reporting was unremarkable.  (*Id.*)  Dr. Wolanin observed that Plaintiff "[a]ppears well.  No signs of apparent distress present.  Speech is clear and appropriate for age. . . . Patient is cooperative.  Facial expression appears pleasant." (*Id.*)  Dr. Wolinan recorded the following muscoloskeletal examination findings: "Walks with a normal gait.  Upper Extremities: Normal to inspection and palpation.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally.  Lower Extremities:  Normal to inspection and palpation.  Strength: Normal and symmetric.  Normal muscle tone bilaterally.  Full ROM bilaterally."  (*Id.*)  He recorded the following neurological examination findings: "Alert and oriented x3.  Mood is normal.  Affect is normal.  Memory is intact. Attention is WNL.  Sensation intact to light touch.  Achilles and patellar DTR's are brisk and symmetrical.  Coordination is normal. Romberg's test is intact."  (*Id.*)   Dr. Wolanin's assessment was "nausea alone," "Hypertrigliceridemia Pure," "Asthma Unspec W/o Status Asthmaticus," and "Insomnia Unspecified."  (R. 354.)

Records from Dr. Wolanin for the period January 25, 2013, to August 2, 2013, which follow the date last insured of December 31, 2012, do not suggest information pertinent to the relevant time period. (R. 510-533.)

19

**b.    Mental Impairments**

As reviewed above, Plaintiff was assessed to have anxiety at many of her office visits with Dr. Wolanin.  Our review of the record shows that Plaintiff rarely presented with symptoms.  Most often Plaintiff appeared well with no signs of distress, she had clear and appropriate speech, was cooperative and had a pleasant facial expression.  (*See*, *e.g.*, R. 353-54, 454-55.)  Her neurological examinations routinely found her to be alert and oriented with normal mood and affect, intact memory, and attention within normal limits.  (*See*, *e.g.*, 354, 455.)

On rare occasions Plaintiff presented with symptoms of anxiety.  For example, on April 6, 2011, Dr. Wolinan noted that Plaintiff was extremely anxious due to her friend's death the day before (R. 441), and on September 12, 2012, Plaintiff presented to Dr. Wolanin with chest pain and he noted that Plaintiff was very anxious and unable to calm down (R. 329).  In an office visit with Dr. Gilliam on August 29, 2012, he noted that Plaintiff was very anxious and tearful.  (R. 218.)

Medical records submitted also show that Plaintiff sought a "psych referral" when she visited Rosaline Riaz, M.D., as a new patient on January 10, 2014.  (R. 484.)

**2.   Opinion Evidence**

Dr. Wolanin completed a Multiple Impairment Questionnaire on November 18, 2013.  (R. 474-481.)  He stated that he had diagnosed

Plaintiff with epilepsy, chronic back pain, depression, anxiety disorder, insomnia, asthma, and hyperlipidemia.  (R. 474.)   He noted that her prognosis was guarded.  (*Id.*)  Dr. Wolinan reported that the following clinical findings supported his diagnosis: "Pt. highly anxious; fearful of surrounds; tenderness along paraspinals, most pronounced in C-spine and L-spine; Decrease ROM through spine secondary to pain."  (*Id.*)  Dr. Wolinan pointed to the following laboratory and diagnostic test results as supportive of his diagnosis: "Pt. followed by neurology for epilepsy; CT scan of C-spine shows mild degenerative joint disease; x-ray lumbar spine shows mild levoscoliosis."  (R. 475.)  The main symptoms identified were back pain, visual/auditory hallucinations, and fatigue-- symptoms which Dr. Wolinan found to be consistent with Plaintiff's impairments.  (*Id.*)  On a scale of 0-10, Dr. Wolinan assessed Plaintiff's pain to be 5-6 and her fatigue to be 2-3.  (R. 476.) He opined that Plaintiff could do a full time job that required her to keep her neck in a constant position, that pain would periodically interfere with her attention and concentration, and he expected her impairments would last at least twelve months.  (R. 478.)  Dr. Wolinan noted that Plaintiff was "very anxious" and this contributed to the severity of Plaintiff's symptoms and functional limitations.  (R. 479.)  He did not believe she was a malingerer. (*Id.*)  He further opined that her impairments were likely to produce good days and bad days and that she would be absent from

work about two to three times per month as a result of her
impairments or treatment.  (R. 480.)  The earliest date he believed
the description of symptoms and limitations in the questionnaire
applied was April 2005.  (R. 480.)

On February 15, 2013, John Rohar, Ph.D., completed the
Disability Determination Explanation.  (R. 99-107.)  He considered
evidence from Dr. Wolanin, Dr. Gilliam, Susanna Ogin (Plaintiff's
mother), and Plaintiff.  (R. 100-01.)  He determined that Plaintiff
had the severe impairments of epilepsy and disorders of the back,
and the non-severe impairments of anxiety disorders and affective
disorders.  (R. 102.)  He analyzed Plaintiff's mental health
impairments using a Psychiatric Review Technique for the date last
insured.  (R. 102-03.)

**3.   Function Report and Hearing Testimony**

Plaintiff's mother, Suzanna Ogin, completed a "Function Report
- Adult - Third Party" on January 21, 2013.  (R. 157-64.)  Ms. Ogin
reports that Plaintiff's conditions impair her ability to work as
follows:

> She has panic attacks, a lot of pain from 2
> car accidents, headaches, unable to sleep
> properly, suffers from epilepsy, anxiety,
> can't drive or operate vehicle under doctor's
> orders.  Carpal tunnel, broken bones w[ith]
> plate & screws.  Had injury (couple)
> reconstructive surgery to face,
> forgetfulness, seeing and hearing things that
> aren't real.

(R. 157.)  Ms. Ogin noted that Plaintiff has a hard time doing

22

house and yard work because she is constantly fighting headaches, pain and anxiety, and she does not have the energy to do much because her medications make her tired.  (R. 159-60.)  She checked every activity listed as being affected by Plaintiff's conditions except understanding, following instructions, and getting along with others.  (R. 162.)

At the ALJ hearing on February 14, 2014, Plaintiff's attorney identified Plaintiff's seizure disorder as well as her back and neck disorders and various psychological issues as the bases of Plaintiff's inability to work (R. 43.)  Plaintiff testified that the following problems have prevented her from working since January 2011:  seizures, the grogginess from related medications, and symptoms associated with the aftermath of a seizure like feeling "wiped out" and memory loss; back problems; and carpal tunnel.  (R. 48.)  She said that her symptoms increased after her 2012 car accident, including hallucinations.  (R. 49.)  She said that even before the accident--from January 2011 to the accident-- she didn't work because of medications and seizures and she was having hallucinations.  (R. 50.)  At the time of her testimony, she reported that she experienced seizures a couple times per month. (R. 50.)  She reported that she had hallucinations associated with seizures about a year before the hearing.  (*Id.*)

Plaintiff testified that she had recently started to see a psychiatrist or psychologist and had seen the provider twice on a

monthly basis.  (R. 54.)

**4.   ALJ Decision**

By decision of April 25, 2014, ALJ Tranguch determined that Plaintiff was not disabled as defined in the Social Security Act through December 31, 2012, the date last insured. (R. 30.)  He made the following findings of fact and conclusions of law:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 26, 2011 through her date last insured of December 31, 2012 (20 CFR 404.1571 et seq).

3.   Through the date last insured, the claimant had the following severe impairment: reported history of seizures and back pain (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b). She could have occasionally lifted and carried up to 20 pounds and frequently lifted and carried 10 pounds.  She could have occasionally used upper extremities for pushing and pulling, such as operating levers or hand controls.  She

24

could have occasionally balanced, bended, kneeled, stooped, crouched, crawled and used ramps and climbed stairs.  She would have been limited to occasional overhead reaching.  She should have avoided concentrated exposure to vibrations and wet or slippery conditions.  She should have avoided occupations that required climbing ladders, ropes, or scaffolds. She should have avoided concentrated exposure to potential pulmonary or respiratory irritants, such as fumes, odors, dusts, gases, and work environments with poor ventilation.  She should have avoided occupations in which she would have been exposed to hazards, such as unprotected heights and dangerous, moving machinery.  She could have performed work that is described as unskilled, involving simple, routine tasks that are not performed in a fast-paced production environment and she could have performed work that is considered low stress, which requires only occasional simple decision making and occasional changes in the work duties or work setting.

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on October 3, 1973 and was 39 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant

25

> has transferable job skills (See SSR 82-
> 41 and 20 CFR Part 404, Subpart P,
> Appendix 2).
>
> 10.  Through the date last insured,
>      considering the claimant's age,
>      education, work experience, and residual
>      functional capacity, there were jobs
>      that existed in significant numbers in
>      the national economy that the claimant
>      could have performed (20 CFR 404.1569
>      and 404.1569(a)).
>
> 11.  The claimant was not under a disability,
>      as defined in the Social Security Act,
>      at any time from January 26, 2011, the
>      amended alleged onset date, through
>      December 31, 2012, the date last insured
>      (20 CFR 404.1520(g)).

(R. 23-30.)  In addition to her severe impairments, the ALJ
determined that Plaintiff also had a history of carpal tunnel
syndrome, headaches, and asthma.  (R. 24.)  Giving great weight to
the Psychiatric Review Technique form completed on February 15,
2013, by Dr. John Rohar, a consulting doctor for the State Agency,
the ALJ found that Plaintiff's mental impairments of depression,
anxiety, and panic attacks, considered singly and in combination,
did not cause more than minimal limitations.  (R. 24-25.)

The ALJ found that Plaintiff's medically determinable
impairments could be expected to cause her alleged symptoms but her
"statements concerning the intensity, persistence and limiting
effects of these symptoms are not entirely credible for the reasons
explained in this decision."  (R. 27.)  The ALJ stated that the
evidence of record did not support the alleged level of incapacity.

26

(*Id.*)  With specific citation to the record, he points to many bases for his conclusion that Plaintiff's alleged symptoms and limitations are not well supported by the objective medical evidence.  (R. 27-28.)

As for opinion evidence, the ALJ gave limited weight to the opinion of Dr. Wolinan set out in the Multiple Impairment Questionnaire because his objective findings did not support the significant limitations and expected absences reported.  (R. 28.)

The ALJ also gave limited weight to the form completed by Plaintiff's mother because there was no evidence that she was a medical professional or was otherwise qualified to assess functional limitations and she also would be biased to support her daughter's claim.  (R. 28.)

The ALJ noted that he took into account Plaintiff's credibly established limitations in determining his RFC.  (R. 28.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4]  It is necessary for the

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate

---

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 29-30.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality

29

> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an

exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v.*

*Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

#### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ failed to keep the records open as requested; 2) the ALJ erred by failing to properly evaluate her mental health impairments; 3) the ALJ erred by failing to properly assess her residual functional capacity; and 4) the ALJ erred by relying on the vocational expert's testimony. (Doc. 15 at 4-7.) Although an ALJ has a heightened duty to develop the record and explore relevant facts where a claimant is unrepresented at a hearing, *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003); *Dobrowolsky*, 606 F.2d at 406, no heightened duty was triggered here because Plaintiff, who proceeds *pro se* on her appeal, was represented at her hearing (*see* R.36). However, because Plaintiff now proceeds *pro se*, we liberally construe her filings pursuant to *Haines v. Kerner*, 404 U.S. 519, 521 (1972). The Court considers Plaintiff's claimed errors with this principle in mind.[5]

---

[5] Although Plaintiff proceeds *pro se*, the document we have construed as the brief in support of her appeal (Doc. 15) is almost a verbatim recitation of the errors asserted before the Appeals Council by Plaintiff's representative, Shaun Beach, of the Binder & Binder law firm. (R. 180-84.)

## 1.   **Failure to Keep Record Open**

Plaintiff first contends the ALJ erred because he did not keep the record open as Plaintiff had requested. (Doc. 15 at 4.) Plaintiff notes the request was based on an EEG study scheduled for April 14, 2014. (*Id.*)  We conclude this error is without merit in that Plaintiff's date last insured was December 31, 2012, and the EEG scheduled for April 14, 2014, would not provide evidence relevant to the time period at issue.  As Defendant argues, Plaintiff must establish that she became disabled prior to the expiration of her insured status.  (Doc. 17 at 11 (citing 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a), 404.131(a); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990)).)  As Defendant also notes, Plaintiff underwent an EEG during the relevant time period (on July 14, 2011) which was normal.  (Doc. 17 at 11 (citing R. 427); *see also* R. 497.)

## 2.   **Evaluation of Mental Health Impairments**

Plaintiff next claims the ALJ failed to properly evaluate her mental health impairments because he did not follow the requirements of 20 C.F.R. § 404.1520a and Social Security Ruling 97-8p.  (Doc. 15 at 4.)  We conclude this claimed error is without merit.

20 C.F.R. § 404.1520a sets out the procedure to be used in the evaluation of mental impairments, noting that a "special technique is used in such evaluation at each level of the administrative

34

review process." 20 C.F.R. § 404.1520a(a).

In *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), the Third

Circuit Court of Appeals explained the relationship of the

Psychiatric Review Technique and the RFC.

> In 1996, the SSA issued Socialy Security Ruling 96-8p "to state the [SSA's] policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits under [the Act]." Ruling 96-8p discussed the PRTF and the role it plays in the five-step analysis:

> > The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p (July 2, 1996).

*Ramirez*, 372 F.3d at 551-52.

Contrary to Plaintiff's contention that the ALJ did not cite evidence in support of his determination and her further assertion that it is a reasonable assumption that the ALJ improperly substituted his opinion for that of a professional because he performed an unsubstantiated Psychiatric Review Technique (Doc. 15 at 5), the ALJ specifically relied on the opinion of John Rohar, Ph.D., who reviewed relevant evidence and completed a Psychiatric Review Technique form on February 15, 2013 (R. 101-03).  (R. 25.)

The claimed inconsistency between the ALJ's finding of mild limitations relating to Plaintiff's mental health impairments and the fact that he provided for psychiatric limitations in the RFC (Doc. 15 at 5) is also without merit.  As set out above, the RFC determination is a more detailed assessment and the ALJ's consideration of specific limitations was proper within the relevant legal framework.  *See* 20 C.F.R. § 404.1545(a)(2).

Finally, we note that Plaintiff does not point to evidence of record which would indicate a contrary result.  Although she states that she goes to counseling every month for her mental illness, has hallucinations on a daily basis, and hears and sees things that she knows are not real (Doc. 15 at 6), the evidence of record does not support these allegations for the relevant time period.  For example, no evidence of record indicates that Plaintiff received

counseling for her mental health issues from January 2011 through December 2012.  Rather, at the ALJ hearing on February 14, 2014, Plaintiff testified that she had just begun mental health treatment two months earlier.  (R. 54.)  Plaintiff's allegations regarding the frequency of hallucinations and hearing/seeing things are contradicted by the record: on October 23, 2011, Plaintiff reported to Dr. Wolinan that she had not had seizures recently (R. 406); at her October 24, 2011, visit with Dr. Gilliam, Plaintiff reported that she had experienced two episodes where she had vivid audio/visual hallucinations (R. 206); on August 1, 2012, Dr. Wolanin reported that Plaintiff was doing well with no new complaints (R. 337) but on August 29, 2012, she told Dr. Gilliam that she was having seizures twice a week which consisted of a "weird feeling" (R. 216); also at the August 29, 2012, visit with Dr. Gilliam Plaintiff reported the same two events where she had audio/visual hallucinations as she had reported at her October 24, 2011, visit (R. 216)--no additional hallucinatory events were reported; and Plaintiff testified on February 14, 2014, that the last time she experienced a hallucination was about a year before (R. 50).  Thus, we find no foundation in the record for Plaintiff's assertions regarding the severity of the symptoms alleged.

**3.   <u>Residual Functional Capacity Assessment</u>**

Plaintiff asserts that the ALJ did not properly assess Plaintiff's RFC because he failed to provide a function by function

assessment of her limitations and capabilities.  (Doc. 15 at 6.)
Specifically, she claims the ALJ did not state how many hours she
could sit, stand, and walk on a continual basis as required by SSR
96-8p and he relied on his own lay opinion to conclude Plaintiff
was capable of light work.  (Doc. 15 at 7.)  We conclude this
claimed error is without merit.

SSR 96-8p states that an ALJ must consider all the relevant
evidence when making his RFC determination.  *Sternberg v.
Commission of Social Sec.*, 438 F. App'x 89, 98 (3d Cir. 2011) (not
precedential). "Moreover, the RFC determination should be
accompanied by 'a clear and satisfactory explication of the basis
on which it rests.'"  *Id.* (quoting *Fargnoli v. Massanari*, 247 F.3d
34, 41 (3d Cir. 2001); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.
1981)).

As noted by Defendant, the ALJ identified how many hours
Plaintiff could sit, stand, and/or walk by limiting Plaintiff to
light work which, according to SSR 83-10, "'requires standing or
walking, off and on, for a total of approximately 6 hours of an 8
hour workday.  Sitting may occur intermittently during the
remaining time.'"  (Doc. 17 at 15 (quoting SSR 83-10, 1983 WL
31251, at *6 (1983)).)

Here the ALJ provided "a clear and satisfactory explication"
of the basis for his RFC determination.  (R. 26-29.)  He discussed
Plaintiff's claimed impairments and the alleged limitations

38

resulting from them.  (R. 27.)  He cited numerous records--
diagnostic studies and physical examinations--in support of his
finding that the evidence does not support Plaintiff's alleged
level of incapacity.  (*Id.*)  As cited by the ALJ and confirmed by
our review of the record set out above, diagnostic studies during
the relevant time period were either normal or showed only slight
abnormalities.  (*See*, *e.g.*, R. 447-50, 496.)  Similarly, Dr.
Wolanin's physical examinations, conducted almost monthly during
the relevant time period, are essentially unremarkable.  (*See*,
*e.g.*, R. 353-54, 454-55.)  He noted Plaintiff's subjective
reporting of pain and anxiety but a thorough review of his office
visit notes shows that objective observation and examination most
often did not provide support for the alleged difficulties.  (*Id.*)

The ALJ specifically discussed Plaintiff's history of
seizures.  (R. 28.)  He referred to evidence during the relevant
time period of normal exam findings and the lack of evidence
regarding further testing and neurologic follow up.  (*Id.*)

Regarding opinion evidence, the ALJ provided adequate reasons
for assigning limited weight to Dr. Wolinan's opinions contained in
the Multiple Impairment Questionnaire.  (R. 28.)  His conclusion
that objective findings did not support the significant limitations
and absences opined by Dr. Wolinan is supported by the ALJ's
earlier citations to the record.  (*See* R. 27.)  Thus, the ALJ's
conclusion is consistent with the requirements of 20 C.F.R. §

39

404.1527(c) concerning the weight to be given an opinion of a

treating source.[6]

_____

[6] Our conclusion that the ALJ properly determined Plaintiff's
RFC is bolstered by our review of Plaintiff's presentation at
office visits and the clinical findings identified by Dr. Wolinan
in the Multiple Impairment Questionnaire.

Although records show that Plaintiff took medications related
to anxiety, seizures, and pain, Plaintiff rarely complained of many
alleged limitations at her monthly visits to Dr. Wolanin. Other
than specific episodic illnesses and events, Plaintiff's most
common, though not consistent, specific complaints were chronic
pain and anxiety. (*See*, *e.g.*, R. 432.)  As discussed in the text,
objective records do not support the limitations alleged.  The
records do not show that Plaintiff identified seizures as a problem
with Dr. Wolinan during the relevant time period.  As set out in
the text, on June 29, 2011, Dr. Wolinan noted that Plaintiff needed
an EEG (R. 429) which she had on July 22, 2011 (R. 496).  The
results were normal. (R. 496.)  Although she went to a
neurologist, Dr. Gilliam, for the problem, she saw him only twice
during the relevant time period. (R. 206, 216.)  Dr. Gilliam noted
on August 29, 2012, that Plaintiff "did not come for the scheduled
video/EEG show she states she is ready at this time." (R. 218.)
Headache and carpal tunnel symptomology and assessments are rarely
mentioned.

Further, Dr. Wolinan's opinions set out in the Multiple
Impairment Questionnaire are undermined by inconsistencies
regarding the objective support cited. (*See* R. 474.) 20 C.F.R. §
404.1527(c)(3) addresses the "supportability" of a medical source
opinion: "The more a medical source presents relevant evidence to
support an opinion, particularly medical signs and laboratory
findings, the more weight we will give the opinion."  Here Dr.
Wolinan identifies the following supportive clinical findings: "Pt.
highly anxious; fearful of surrounds; tenderness along paraspinals,
most pronounced in C-spine and L-spine; Decrease ROM through spine
secondary to pain." (R. 474.)  However, Dr. Wolinan's office notes
do not mention fearfulness of surroundings and indicate he found
Plaintiff anxious only on two occasions. (R. 329, 441.)  The
records show that Plaintiff most often appeared well and in no
distress, she was alert and oriented, had normal mood, affect, and
attention, and was pleasant and cooperative. (*See*, *e.g.*, R. 353-
54, 454-55.)  Similarly, Dr. Wolinan's muculoskeletal examinations
rarely noted tenderness along the paraspinals, and then he noted at
most moderate tenderness of limited duration (*e.g.*, tenderness

**4.**   **Vocational Expert Testimony**

Plaintiff's last claimed error relates to step five of the sequential process in that she claims the ALJ improperly relied on the Vocational Expert's testimony because the reasoning levels required for the jobs identified are in excess of her capabilities.  (Doc. 15 at 7.)  We conclude the ALJ did not err on this basis.

In his RFC determination, the ALJ found in relevant part that Plaintiff could do light work "that is described as unskilled, involving simple, routine tasks . . . and she could have performed work that is considered low stress, which requires only occasional simple decision making and occasional changes in the work duties or work setting."  (R. 26.)  Plaintiff maintains that, even though the jobs identified by the VE are unskilled, the associated reasoning levels three and four are in excess of the limitations identified by the ALJ.  With this argument, Plaintiff seems to equate the ALJ's determination that she could perform simple, routine tasks

---

noted in March 2011 but not in February or April).  (R. 442, 444, 452.) Contrary to his opinion statement, Dr. Wolinan routinely found Plaintiff to have normal range of motion on examination, even when he found tenderness.  (*See*, *e.g.*, R. 344, 445, 455.)

Similarly, the laboratory and diagnostic test results cited do not provide the suggested support.  Dr. Wolinan pointed to the following: "Pt. followed by neurology for epilepsy; CT scan of C-spine shows mild degenerative joint disease; x-ray lumbar spine shows mild levoscoliosis."  (R. 475.)  As noted in the text, the only diagnostic test related to epilepsy--the July 14, 2011, EEG--was normal.  (R. 496.)  The mild findings of the other tests cited undermine his opinion regarding serious limitations.  (R. 475-80.)

that required occasional simple decision-making with a limitation
to jobs with a reasoning level of one which involves an ability to
carry out simple "one or two step instructions."  (Doc. 15 at 9.)

Although we disagree that a limitation to simple, routine,
tasks limits Plaintiff to jobs with a reasoning level of one,
whether reasoning level three is consistent with such limitations
is a more difficult question.  Fortunately, the Third Circuit Court
of Appeals addressed the issue at length in *Zirnsak v. Colvin*, 777
F.3d 607, 616-17 (3d Cir. 2014).  In *Zirnsak*, the issue arose in
the context of the plaintiff's assertion that the ALJ's failure to
resolve conflicts between the VE's testimony and the Dictionary of
Occupational Titles ("DOT") warranted remand where the VE testified
that the plaintiff could work at jobs the DOT identified as having
a GED reasoning level of three and the claimed inconsistency with
the ALJ's finding that the plaintiff was "limited to simple and
repetitive tasks involving routine work processes and settings."
*Id.* at 617.  *Zirnsak* set out a full explanation of the ALJ's step
five obligation and the proper resolution of the issue presented.

> In step five of the disability inquiry, the
> Commissioner bears the burden of establishing
> the existence of jobs in the national economy
> that an individual with the claimant's
> impairments is capable of performing.  20
> C.F.R. § 404.1520(a)(4)(v), § 404.1560(2014);
> *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir.
> 1987).  To determine what type of work (if
> any) a particular claimant is capable of
> performing, the Commissioner uses a variety
> of sources of information, including the DOT,
> the SSA's own regulatory policies and

definitions (found in the Code of Federal
Regulations ("CFR")), and testimony from
VE's.

"The DOT is a vocational dictionary that
lists and defines all jobs available in the
national economy and specifies what
qualifications are needed to perform each
job." *McHerrin v. Astrue*, Civil Action No.
09-2035, 2010 WL 3516433, at *3 (E.D. Pa Aug.
31, 2010) (citing SSR 00-4p, 2000 WL 1898704
(Dec. 4, 2000)).  The qualification
categories listed by the DOT for each job
include the job's Strength level, General
Educational Development ("GED") level and its
Specific Vocational Preparation ("SVP")
level.  Appendix C, Dictionary of
Occupational Titles, available at
www.occupationalinfo.org/appendxc_1. html.
Strength level "reflects the estimated
overall strength requirement of the job."
*Id.*  GED measures the "those aspects of
education (formal and informal) which are
required of the worker for satisfactory job
performance."  *Id.*  GED is broken into three
categories: (1) reasoning development, (2)
mathematical development, and (3) language
development.  *Id.*  Reasoning levels in the
DOT range from level 1 to level 6. *Id.*
Important to this case, jobs with a reasoning
level of 3 require that an employee be able
to "[a]pply commonsense understanding to
carry out instructions furnished in written,
oral, or diagrammatic form [and d]eal with
problems involving several concrete variables
in or from standardized situations."  *Id.*

SVP levels, on the other hand, measure
the skill level necessary to perform a
particular job.  SSR 00-4p, 2000 WL 1898704,
at *3 (Dec. 4, 2000).  "A skill is knowledge
of a work activity that requires the exercise
of significant judment that goes beyond the
carrying out of simple job duties."  *Id.*  SVP
levels in the DOT range from level 1 to level
9.  *Id.*  The DOT skill levels correspond with
the second source of information relied on by
the Commissioner: the CFR.  Section 404.1568

of the CFR classifies occupations into three
categories: unskilled, semi-skilled, and
skilled. 20 C.F.R. § 404.1568(a)-(c) (2014).
Unskilled work is defined as "work which
needs little or no judgment to do simple
duties that can be learned on the job in a
short period of time." *Id.* § 404.1568(a).
Unskilled work corresponds to an SVP level of
1-2; semi-skilled work corresponds to an SVP
level of 3-4; and skilled work corresponds to
an SVP level of 5-9.  SSR 00-4p, WL 1898704,
at *3 (Dec. 4, 2000).

    The Commissioner can also rely on
testimony from a VE to meet its step-five
evidentiary burden.  20 C.F.R. § 404.1566(e).
VE's are most commonly used to provide
evidence at hearings before ALJ's to resolve
complex vocational issues.  SSR 00-4p, 2000
WL 1898704, at *3 (Dec. 4, 2000).  However, a
common issue--and the one argued by Zirnsak
on appeal--arises when a VE's testimony
conflicts with other sources of information
relied on by the Commissioner, namely the
DOT.  As a general rule, occupational
evidence provided by a VE should be
consistent with the occupational evidence
presented in the DOT.  *Id.* at *2.  To ensure
consistency, courts have imposed an
obligation on ALJ's to "[i]dentify and obtain
a reasonable explanation for any conflicts
between occupational evidence provided by
VE's...and information in the [DOT]."  *Id.* at
*1; *Rutherford*, 399 F.3d at 556.
Specifically, an ALJ is required to (1) ask,
on the record, whether the VE's testimony is
consistent with the DOT, (2) "elicit a
reasonable explanation" where an
inconsistency does appear, and (3) explain in
its decision "how the conflict was resolved."
*Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir.
2002).  An ALJ's failure to comply with these
requirements may warrant remand in a
particular case.  *Rutherford*, 399 F.3d at
557.  However, this Circuit has emphasized
that the presence of inconsistencies does not
mandate remand, so long as "substantial
evidence exists in other portions of the

record that can form an appropriate basis to
support the result." *Id.* (citing *Boone v.
Barnhart*, 353 F.3d 203, 209 (3d Cir. 2004)).

777 F.3d at 616-17.

The plaintiff in *Zirnsak* alleged that the VE's testimony at
the hearing conflicted with the with the DOT in two ways.  777 F.3d
at 617.  The first inconsistency, relevant to the situation here,
involved the VE's testimony that the plaintiff was capable of
working as an order clerk, charge account clerk, or telephone
quotation clerk--all three occupations have a GED reasoning level
of three which the plaintiff claimed to be inconsistent with the
ALJ's finding that she was "limited to simple and repetitive tasks
involving routine work processes and settings." *Id.*

Finding as a threshold matter that the ALJ met his affirmative
obligation to inquire about inconsistencies, the Court noted the VE
responded that her testimony was consistent except for the fact
that the DOT does not address a sit/stand option for subassembler
positions but did not note the inconsistency regarding reading
level argued on appeal. *Id.* The Court found it significant that
neither the plaintiff nor her attorney challenged the VE on the
issue "or otherwise identified any apparent inconsistency between
the VE's testimony and the DOT." *Id.* (citing *Clawson v. Astrue*,
Civil Action No. 11-294, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15,
2013).  "Because the VE did not identify the reasoning level
inconsistency at the hearing, the ALJ did not elicit an explanation

45

for that inconsistency or explain in its decision how the conflict was resolved." *Id.* (citing *Burns*, 312 F.3d at 127).  Therefore, the next step was for the Court to determine whether substantial evidence in the record supported the ALJ's determination.  *Id.* (citing *Boone*, 353 F.3d at 209).  The Court then reviewed legal authority relevant to the issue.

> There is a split of authority as to whether an inherent conflict exists between a job requiring level 3 reasoning and a finding that a claimant should be limited to simple, routine tasks and unskilled work.  Several courts have held that a finding limiting a claimant to simple, repetitive tasks is inconsistent with a job requiring a reasoning level of 3.  *E.g.*, *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *McHerrin*, 2010 WL 3516433, at *5.  These courts have found that claimants limited to simple, repetitive tasks are better suited for jobs that require level 2 reasoning.  *E.g.*, *Hackett*, 395 F.3d at 1176.  Further, they have held that an SVP classification of a job as unskilled does not neutralize the conflict between a limitation to simple tasks and a job requiring level 3 reasoning .  *McHerrin*, 2010 WL 3516433, at *6 (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997)).
>
> On the other hand, several courts have found that there is not a "per se conflict between a reasoning level 3 job and [a] limitation to simple, routine tasks/unskilled work."  *E.g.*, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007); *Clawson v. Astrue*, Civil Action No. 11-294, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15, 2013); *Simpson v. Astrue*, Civil Action No. 10-2874, 2011 WL 1883124, at *7 (E.D. Pa. May 17, 2011).  These courts have focused on whether a failure to inquire about or reconcile a conflict caused any harm to the claimant when

> determining whether remand is necessary. *Simpson*, 2011 WL 1883124, at *5. These courts have found that any error stemming from an ALJ's failure to ask about a conflict was harmless where the record established that the claimant in question could perform a level 3 reasoning job, despite a limitation to simple work. *Terry*, 580 F.3d at 478; *Renfrow*, 496 F.3d at 921; *Simpson*, 2011 WL 1883124, at *7. These courts have identified certain factors that influenced their reasoning. First, in *Terry*, the Seventh Circuit noted that the claimant in that case "[did] not argue that she [could not] perform these skills, perhaps because the record suggest[ed] she [could]." *Terry*, 580 F.3d at 478. Next, it emphasized that because the claimant did not point out the conflict at trial, she was required to show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Id.* (alteration in original) (quoting *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). Finally, these courts noted that the jobs listed by the VE were only representative examples--not an exhaustive list--of jobs that the claimant was capable of performing. *Simpson*, 2011 WL 1883124, at *8 (citing *Rutherford*, 399 F.3d at 557).

777 F.3d at 617-18.

Based on this case review, the Court concluded "that there is no bright-line rule stating whether there is a per se conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work." *Id.* at 618. In the absence of controlling precedent, the Court concluded the facts were most analogous to *Terry* and *Simpson*. *Id.* Thus, the Court focused on whether the plaintiff had been harmed by the ALJ's failure to address the alleged inconsistency, looking at the

factors found relevant in *Terry* and *Simpson*.  *Id.* at 618-19.  The relevant facts included that the plaintiff did not seriously argue that she was incapable of performing the jobs recommended by the VE and the record showed that she could perform the jobs of order clerk, charge account clerk or telephone quotation clerk: the plaintiff had completed tenth grade; she had previous experience working as both a clerk and bookkeeper; the objective medical record was deemed unsupportive of her allegations of disabling mental impairments; at numerous evaluations during the relevant time period she was noted to be oriented, calm, and psychologically appropriate; she received only conservative treatment--primarily medication during the relevant time period; and her account of daily living was "relatively full and independent."  *Id.* Additional similarities were that the plaintiff's counsel did not identify any inconsistencies at the VE hearing as was the case in *Terry* and *Simpson* and, finally, as in *Simpson*, the occupations listed by the VE were only "a couple examples" of jobs available to the plaintiff.  *Id.* at 619 (citing *Simpson*, 2011 WL 1883124, at *8 (citing *Rutherford*, 399 F.3d at 557)).  The Circuit Court concluded "the combination of these factors compels our finding that 'any conflict [was] not so obvious that the ALJ should have pursued the question.'"  *Id.* (quoting *Simpson*, 2011 WL 1883124, at *7 (alteration in original) (quoting *Terry*, 580 F.3d 476)).

Here Defendant does not dispute Plaintiff's assertion that two

48

of the jobs identified by the VE--mail sorter and records
processor--require a reasoning level of three and the third
position identified--information clerk--requires a reasoning level
of four.  (Doc. 15 at 8-9; Doc. 17 at 18-20.)  As in *Zirnsak*,
Plaintiff now claims there was a conflict between the DOT and the
VE's testimony.  (Doc. 15 at 7-10.) Our case is also analogous in
that ALJ Tranguch asked if there was a conflict (R. 71), the VE's
response did not identify the reasoning level issue (*id.*), and
neither Plaintiff nor her attorney challenged the VE on the point
now alleged or otherwise identified any apparent inconsistency
between the VE's testimony and the DOT.  777 F.3d at 617-18.
Because the VE did not identify the reasoning level inconsistency
at the hearing, the ALJ did not elicit an explanation for that
inconsistency or explain in his decision how the conflict was
resolved.  Thus, as in *Zirnsak*, we will focus on whether the
"failure to inquire about or reconcile a conflict caused any harm"
to Plaintiff and, if the "ALJ's failure to ask about [the] conflict
was harmless," remand is not necessary.  777 F.3d at 618 (citations
omitted).

In addition to the similarities discussed above, this case
presents other parallels to *Zirnsak*: Plaintiff did not argue she
could not perform the jobs identified (*see* Doc. 15 at 7-10)[7]; she

---

[7] Plaintiff's only specific argument does not go to reasoning
level but to attendance: she states "if I missed 3 to 4 days of
work a month there was [sic] no jobs for me.  This was on my

has a high school education (R. 29); her previous experience as a
mail carrier required technical knowledge and skills, as well as
writing and completing reports (R. 150); the objective medical
record was deemed unsupportive of her allegations of disabling
mental and physical impairments (R. 28-30); at numerous evaluations
during the relevant time period it was noted that Plaintiff
appeared well, was in no apparent distress, she was alert and
oriented, had normal mood and affect, her memory was intact, and
her attention was within normal limits (*see*, *e.g.*, R. 343-44); at
most evaluations Plaintiff's physical examinations were
unremarkable with only occasional mild to moderate tenderness of
the spine noted (*see*, *e.g.*, R. 442, 445)[8]; she received only
conservative treatment--medication--during the relevant time
period; she was found to be essentially independent in her daily
activities (R. 28); and the ALJ listed the identified positions as
examples of jobs Plaintiff could perform (R. 30).

---

medical impairments questoner [sic] from Dr. Wolinan but this part
was left out of the paperwork." (Doc. 15 at 10.) As discussed in
the text, the Multiple Impairment Questionnaire completed by Dr.
Wolinan was included in the record and indicated that he would
estimate that Plaintiff would miss work on average two to three
times per month because of her impairments. (R. 480.) Also, as
discussed in the text, the ALJ appropriately gave this opinion
limited weight. (R. 28.)

[8] As previously set out in the text, examples of the sporadic
nature of Plaintiff's symptoms include Dr. Wolinan's March 4, 2011,
finding on musculoskeletal examination that Plaintiff had "moderate
midline tenderness of the spine" (R. 445) and no tenderness or
other muculoskeletal problem was noted at her visit one month later
on April 6, 2011 (R. 442).

The combination of these factors compels the same finding as in *Zirnsak* that "'any conflict [was] not so obvious that the ALJ should have pursued the question.'"  777 F.3d at 619 (quoting *Simpson*, 2011 WL 1883124, at *7 (alteration in original) (quoting *Terry*, 580 F.3d at 478).  Absent evidence that Plaintiff was harmed by the ALJ's determination, we find, as the Court did in *Simpson*, that "any perceived inconsistency between a limitation to 'simple, routine tasks' and a reasoning level of 3 is 'simply not egregious enough—either in number or in substance—to bring into question the ALJ's reliance on the expert testimony as a whole.'"  2011 WL 1883124, at *8 (quoting *Young v. Astrue*, Civ. A. No. 09-2834, 2010 WL 2135627, at *7 (E.D. Pa. May 26, 2010) (citing *Rutherford*, 399 F.3d at 558)).  Because the record as a whole, including the VE's testimony, provided substantial evidence for the ALJ's determination that Plaintiff was not disabled, remand is not warranted.

## V. Conclusion

For the reasons discussed above, we have found all claimed errors to be without merit.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: June 23, 2015